IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **YOLANDA RODRÍGUEZ DE PAYANO AND CONJUGAL PARTNERSHIP CONSTITUTED WITH PEDRO PAYANO AND HER;** | CIVIL NO. 16-2599 |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| **AMERICA CRUISE FERRIES, INC.; BAJA FERRIES USA; INSUANCE COMPANY A;** | |
| Defendants. | |

**COMPLAINT**

**TO THE HONORABLE COURT:**

NOW COMES the Plaintiff, **Yolanda Rodríguez de Payano and conjugal partnership constituted with Pedro Payano and her;** through the undersigned attorneys and respectfully alleges and prays as follows:

**I. INTRODUCTION**

1.     This is a federal question action filed by plaintiff to redress her injuries suffered due to the intentional and/or negligent acts committed by defendants, related to a chain of negligent acts occurred between August 16 and August 17, 2016.

1

## II.    JURISDICTION AND VENUE

2.    This Court has Admiralty and Maritime Jurisdiction and the claim in within the meaning of Fed. R. Civ. P.9 (h). Admiralty and Maritime Jurisdiction is based upon 28 U.S.C. §1331 and 28 USC §1333.

3.    Moreover, the jurisdiction in this case is also founded pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiff, **Yolanda Rodríguez de Payano,** and Defendant, a corporation registered and with place of business in Puerto Rico. Furthermore, the amount in controversy in the Complaint exclusive of interests and costs exceeds seventy five thousand dollars ($75,000.00).

4.    Venue of this action in this district is proper pursuant to 28 U.S.C. Sec. 1391 (b), since the incident occurred on the navigable waters of the United States in connection with traditional maritime activity such as ferrying passengers from the Dominican Republic to Puerto Rico aboard the M/V Caribbean Fantasy and/or since defendant consented to be sued in PR Federal Court pursuant to Admiralty and Maritime law.

## III.    REQUEST FOR JURY TRIAL

5.    Plaintiff requests trial by jury.

## IV.    PARTIES

6.    Plaintiff **Yolanda Rodríguez de Payano,** of legal age, married with Mr. Pedro Payano, with the following address: Calle Primera El Play #11,

2

Proyecto Caño Hondo, Sabana del Lamar, Santo Domingo, República Dominicana.

7.     Defendant **AMERICA CRUISE FERRIES**, **INC.** (herein "ACF") is a corporation duly registered and authorized by the state of Puerto Rico with principal offices in Concordia 249, Mayaguez, PR 00680. Their Resident Agent is: Néstor González García, located at Concordia 249, Mayaguez, PR 00680.

8.     Defendant **BAJA FERRIES USA** (herein "BAJA FERRIES") is a corporation duly registered and authorized by the state of Miami, Florida with principal offices in 2601 S Bayshore Dr # 1110, Miami, FL 33133, USA.

9.     Defendants **Insurance Company A** so named because its real name is unknown at present, are insurance companies, who had issued insurance policies in favor of one or more of the other defendant to this action and/or third parties, which cover events and damages as those suffered by Plaintiff as are more particularly set forth herein below.

### V.     STATEMENT OF CLAIM

### a. Information regarding M/V Caribbean Fantasy (herein "The Ferry")

10.     At all relevant times ACF managed the vessel known as **M/V CARIBBEAN FANTASY**.

11.     At all relevant times ACF operated the vessel known as **M/V CARIBBEAN FANTASY**.

12.     At all relevant times ACF lease the vessel known as **M/V CARIBBEAN FANTASY**.

3

13.    At all relevant times BAJA FERRIES owned the vessel known as **M/V CARIBBEAN FANTASY**.

14.    At all relevant times BAJA FERRIES provides maintenance to the vessel known as **M/V CARIBBEAN FANTASY**.

**b. The incidents**

15.    On July 29, 2016, Plaintiff bought the ticket for the voyage departing on August 16, 2016 from Santo Domingo, Dominican Republic, to Puerto Rico.

16.    Plaintiff paid the total amount of $165.48.

17.    This was Plaintiff's first trip to Puerto Rico.

18.    The voyage was supposed to be a roundtrip leaving on August 16, 2016 and returning on October 12, 2016.

19.    The Ferry carried approximately 512 passengers/crewmembers.

20.    Plaintiff checked in on August 16, 2016, at 2.52 pm, and between 7pm-8pm the Ferry departed.

21.    Although Plaintiff was happy to travel to PR her happiness was destroyed when she started noticing the Ferry's defects.

22.    On August 17, 2016, around 12am, Plaintiff tried to sleep at the Rest Area.

23.    Since the air conditioning was not working well, she started sweating and could not sleep well.

24.    Due to the high temperatures at the Rest Area, Plaintiff was not able to sleep.

25.    Plaintiff noted there was no good air circulation on the common areas.

26.    At approximately 6.30am, Plaintiff smelled a some rare odor and walked around the Ferry with other passengers.

27.    At approximately 7am, the Ferry started burning and Plaintiff noticed heavy smoke.

28.    While at deck 7 (bow), she saw a chaotic scene, since people were hysterical, screaming, pushing each other and shouting.

29.    While waiting at deck 7 (bow), Plaintiff started inhaling smoke generating from the fire onboard the Ferry.

30.    Crewmembers stated that the first ones that will board the life rafts were minors, mothers and elders.

31.    After that announcement, Plaintiff awaited approximately 1 hour.

32.    Plaintiff does not know how to swim.

33.    Plaintiff thought that he would die if he fell to the ocean since she was unable to swim.

34.    Finally, Plaintiff was instructed to board the life raft.

35.    The Ferry's crewmembers instructed Plaintiff to leave at the Ferry her personal luggage.

36.    While descending to the water, the life raft got stuck, and it started hitting the Ferry.

37.    Plaintiff had a feeling that the raft boat would break in any time.

38.    The passengers aboard the life raft were desperate and it almost tip over the life raft.

39.    Plaintiff got a nervous attack.

40.    No seat belt was available at the raft boat.

41.    At the life raft there was nowhere to hang on.

42.    Thus while onboard the life raft she had the feeling that she could fall to the ocean anytime.

43.    The life raft was not prepared for this emergency.

44.    Despite being on the ocean, the life raft continue striking with the Ferry since no effort was made to get away the ferry.

45.    Plaintiff vomited several times while on the life raft. Plaintiff was screaming, crying and in deep pain.

46.    While hitting the Ferry, Plaintiff hit her finger and got a pain akin fissure on her finger.

47.    Plaintiff was extremely anxious, with constant crying spells, with nausea, felt dizzy, stomach ache, dehydrated and weak.

48.    Approximately after one hour of being on the life raft hitting the ferry and thinking that the raft boat will sink in any moment, the crewmembers finally started the engine and they took us to the terminal.

49.    No medical attention was provided to Plaintiff.

50.    Plaintiff was taken to her cousin's house and there she felt with high blood pressure, nausea, dizzy, dehydrated, with stomach, chest and head ache and with constant crying spells, among others.

51.     As a result of this incident, Plaintiff assured that she will never travel again on a ferry/cruise.

52.     Such injuries occurred as a proximate result of the unsafe, negligent and unseaworthy condition of the vessel operated by Defendants.

**FIRST CAUSE OF ACTION – NEGLIGENCE**

53.     The allegations contained all in previous paragraphs are re-alleged as if fully alleged herein.

54.     The Ferry was built in 1989 in Japan, and is Baja Ferries property.

55.     The Ferry's flag is from Panamá.

56.     The Ferry do commercial activities between Dominican Republic and Puerto Rico such as ferrying passengers.

57.     Between 2011 and 2015, the US Coast Guard found at least 107 security deficiencies, which most of the them (approximately 44) were related to the fire system.

58.     Some of those deficiencies were related to the incorrect operating of the fire screen doors, which usually were not able to be close and/or were reported as open when they were close.

59.     On an October 16, 2014, Inspection made by the USCG stated that the "inflatable liferafts used in conjunction with MES shall comply with the requirements of Section 4-2. The liferafts 4, 13,17,18 &24 were found with the painter lines falling off the liferaft line storage pockets".

60.     A January 2015 inspection made by the United States Coast Guard ("herein "USCG") stated that oil fuel lines should be screened or protected in some way to avoid any pray or leakage onto ignition sources.

61.     Specifically in April 17, 2015, the USCG stated that the "fire screen doors shall be capable of closing at an angle of inclination of up to 3.5 degrees. The following double leaf doors were found out of sequencing and prevents the doors from closing" and that "all waste receptacles shall be constructed of non combustible materials. Waste receptacles located on upper deck (open) were found to be plastic".

62.     During the past 36 months, USCG's inspections of the Ferries had led to detentions.

63.     In October, 2015, the Ferry was detained in San Juan for three days by the U.S. Coast Guard for three deficiencies related: fire safety measures (international shore connection); crew certificates (certificates of competency) and ship's certificates and documents (safety manning document).

64.     Other warnings provided by the US Coast Guard were that the fire extinguishers were not working well.

65.     The US Coast Guard found deficiencies on the ceiling sprinklers that stop the flames.

66.     Between March and July 2016, the Ferry underwent maintenance work at Europe.

67.    Even though defendants informed the public that they would start operating on July 1, 2016, they were unable to provide ferrying service to passengers since the Ferry was still in Europe receiving maintenance.

68.    In July 2016, while refueling the Ferry at Port of Gibraltar, prior to continuing across the Atlantic to Puerto Rico, the Ferry was detained for six days and related to deficiencies related to the auxiliary engines.

69.    After the alleged repairs at the Port of Gibraltar, the Ferry continued its voyage to Puerto Rico.

70.    While in their voyage, the Ferry's engines failed.

71.    The ferry was unable to continue their voyage for approximately a day.

72.    Due to said mechanical failure, the Ferry changed its voyage and travel to Santo Domingo, Dominican Republic.

73.    At the Santo Domingo's Port, the Ferry allegedly repaired the engine.

74.    Early August, 2016, the Ferry arrived at the Port of San Juan, Puerto Rico.

75.    During the USCG inspection, they determined that one of three life rafts were working.

76.    A USCG inspection early August 2016, found four deficiencies related to fire safety measures and one related to the propulsion and auxiliary machinery.

77.    During August 17, 2016's emergency, the Ferry's life rafts were not working properly.

9

78.   Two of the three life rafts were not working well.

79.   One life raft got stuck while descending.

80.   The second life raft, got stuck while descending to the ocean and when it reached the ocean its engines failed.

81.   This second life raft, was rescued by other vessel and/or vessels.

82.   During the voyage from Santo Domingo to San Juan, and while Plaintiff was onboard the Ferry, the air conditioner was not working well and/or was not working at all.

83.   Such was an indication of mechanical and/or electrical failure.

84.   Due to information and/or belief the Fire started at 7.15 am at the machinery room.

85.   The Fire started when the Ferry was near the Thermoelectric in Levittown, PR.

86.   Plaintiff's damages were a direct consequence of defendants' negligence by:  (i) failing to provide a safe ferry; (ii) failing to protect the passengers; (iii) failing to maintain safe premises; (d) failing to provide adequate emergency instructions; (iv) by failing to hire adequate personnel which were not well trained and/or had lack of knowledge on emergency proceedings and/or had lack of knowledge on descending life rafts; (v) by failing to repair and/or properly repair the engine, electric and/or propulsion defects; (vi) Defendants knew or should have known of the Ferry's mechanical, electrical and/or propulsion defects and did not repair it and/or failed to properly repair them; (vii)  Defendants' breached their duty of care to Plaintiff to the extent they failed

to properly maintain properly working the life rafts and other safety equipment; (viii)  defendant provoked Plaintiff unnecessary delay in the evacuation of the Ferry; (ix) failed to cancel the voyage despite knowing that the vessel was not properly working; (x) the Ferry was operated knowing was unseaworthy due to the defective engines, life rafts, electricity, air conditioners, emergency equipment and procedures.

87.   Due to the abovementioned, defendants failed to comply with the general maritime and admiralty law of the United States and with the Art. 1802 and 1803 of the PR Civil Code.

88.   Defendants actions and omissions, through fault and/or negligence, caused damages to Plaintiff, in violation of Art. 1802 and 1803 of the PR Civil Code and General Maritime Law entitling plaintiff to damages caused as a result of those acts and omissions.

89.   Defendants are jointly liable against Plaintiff.

90.   Defendants' negligence and/or intentional acts were a proximate legal cause of Plaintiff's injury.

91.   On the other hand, as previously mentioned, on July 29, 2016, Plaintiff bought the tickets for the voyage departing on August 16, 2016 from Santo Domingo, Dominican Republic, to Puerto Rico.

92.   Plaintiff paid the total amount of $165.48.

93.   In view that Plaintiff were unable to enjoy the Ferry and the Ferry was unable to reach the Port that was hired, then Defendants shall reimburse Plaintiff the total amount of $424.90 and also be compensated for the total

11

amount of $1,000.00 due to the fact that when the ferry returned the luggage, the clothe inside the luggage was damaged.

## SECOND CAUSE OF ACTION – UNSEAWORTHINESS

94.   The allegations contained all in previous paragraphs are realleged as if fully alleged herein.

95.   Defendants maintained an unsafe place for plaintiff and exposed er to danger while ferrying passengers with a Ferry with serious engine, electricity and propulsion defects and also with the life rafts, mechanical and technical defects, as abovementioned.

96.   The vessel was unseaworthy and defendants' failed to repair the dangerous situation.

97.   Plaintiff's injuries occurred as a proximate result of the unsafe and unseaworthy condition of the vessel, which was managed, operated and/or maintained by defendants. In addition, said injuries were caused in whole, as a proximate result of negligence on the part of the Defendants, its agents, servants and/or employees.

## THIRD CAUSE OF ACTION – CLAIM AGAINST THE INSURANCE

98.   The foregoing paragraphs are realleged and reasserted herein.

99.   Co-defendant Company X is liable for the negligence, fault, legal violations and unseaworthy conditions of their insured up to the coverage limit to their benefit. Plaintiff hereby exercises their right to present a direct action against the aforementioned insurance company, which until today, its name is unknown.

12

**DAMAGES**

100.  As a result thereof, plaintiff suffered and continue suffering: finger trauma, chest pain, post traumatic stress disorder, unable to get close to the ocean, muscle pain, dizziness, nausea, psychiatric and psychological damages, extreme panic, sadness, anxiety during the ordeal, vomit, a sense of despair and helplessness, dehydration, a lack of interest in daily activities, insomnia and other sleep disturbances such as nightmares, depression, her tranquility has been seriously affected, suffered economic losses, all of which affects her daily activities.

101.  Plaintiff damages herein alleged apply to all causes of actions.

102.  As a result of the events described herein, Plaintiff has suffered and continues to suffer irreparable physical, economical and emotional damages.

**VI. RELIEF**

103.  Wherefore, plaintiff prays that this court enter judgment in favor of plaintiff and against defendants and award the plaintiff the following monetary amounts, totaling $1,204,424.90 to be paid by defendants:

a.    For her emotional damages and pain and suffering, an amount which is estimated at this time to be in excess of $600,000.00.

b.    For her physical damages, an amount which is estimated at this time to be in excess of $400,000.00.

c.    Punitive damages for an amount not less than $200,000.00.

d.    For Economic Damages, an amount not less than $1,424.90.

e.   Provide for the payment of all applicable interests, including prejudgment interest, together with reasonable attorney's fees, litigation expenses and the costs of this action.

f.   Grant plaintiff such other and further relief as the Court may deem appropriate and proper and retain jurisdiction over this action in order to assure full compliance with any decree issued by this court.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 7th day of September, 2016.

**BELLVER ESPINOSA LAW FIRM**
Condominio El Centro I, Suite 801
500 Muñoz Rivera Avenue
San Juan, Puerto Rico 00918
Tel(787) 946-5268/Fax(787)946-0062

S/Alejandro Bellver Espinosa
Alejandro Bellver Espinosa, Esq.
U.S.D.C. – P.R. 225708
Email: alejandro@bellverlaw.com

/s/ Krystal Santiago Sánchez
Krystal Santiago Sánchez, Esq.
U.S.D.C. – PR 303611
Email: krystal@bellverlaw.com